Good morning, Illinois public court 1st district court is now in session. The 4th division, the honorable justice Mary Kay Rockford presiding case number. 22 dash 1, 5, 6, 8, Jason Hill versus DePaul University. Good morning everyone. I am Mary Kay Rockford and I'm along with justice Hoffman and justice Martin. We will be hearing the oral arguments in this case today. We would like to give the opportunity for each side to present their arguments. They will have a 20 minute time period and then the apple lot will have 5 minutes in reply. May we hear who is going to be arguing for the apple on please. Good morning, your honor Giana schedule facility for Jason Hill. And who will be arguing for the. Good morning, your honor Rachel sponsored on behalf of the. Okay, the, the, maybe again, please. Good morning and may it please the court may reserve time for a rebuttal. You will have 20 minutes now and 5 minutes for rebuttal. Thank you, your honor, your honors. Today we stand here at a crossroads where the values of academic freedom. Freedom of speech and protection against discrimination intersect. Along with 1 of the most contentious issues of our time. The Israel Palestine conflict, Jason Hill, a distinguished professor at DePaul University. You know, I'm sorry. I'm sorry to interrupt you. The panel ideas that I. Notify the parties that we are really familiar with the facts of the case, but we really wish to hear today is that that the attorneys go through each count and talk about the elements and the legal issues involved. So, thank you to not have said that at the beginning. No problem. All right, we are appealing counts 1 through 4, which were dismissed with prejudice. Under a 2, 6, 1, 5 motion to dismiss standard. A motion to dismiss under 2, 6, 1, 5 and so what motion in ruling on a 2, 6, 1, 5 motion, the court accepts. All well, put allegations and the please are liberal, liberally construed and all reasonable inferences are. Resolved in the plaintiff's favor. Here we, the 1st count that we appeal is. The decimation per se count, which is count to. What happened to count 1? Well, I was going to go to count 1. Actually, you're right. Let's start with count 1, which is the breach of contract. Regarding the breach of contract, we have a faculty resolution. That was passed by 1 of by 1 and spearheaded by. Hey, which is 1 of the defendants in this case. This was an unprecedented action that occurred. It did not follow any of the protocol that was required. As set forth in the faculty council guidelines. Specifically, we have the section 4.4, which outlines. The disciplinary matters and how to be handled. The public procedure, can I ask you a question? Is censorship discipline your honor? Because right now we have a situation where there's supposed to be academic freedom. And creative expression, and we have a professor who's a professor of philosophy, where he's supposed to challenge. And search out truth and have that creativity to be able to do so. But, but, but my question is, is it discipline? I mean, certainly it's a statement by the faculty council. They take issue with the opinions in this article and very strongly take opinions. Or take issue, but is censorship discipline. Well, right now, when you look at it, your honor respectfully, I'm going to ask you to not piecemeal and say that it's just censorship as disciplines because right now, when you look at the aggregate effect of this resolution cause, we have classes being boycotted. That's the result, but my question is a discipline. Because almost all of the sections that you talk about are disciplinary provisions, major infractions, major separation, demotion, loss of censorship, but your AAUP guideline speaks of censorship and discipline in the disjunctives, not in the conjunctives. So, it would appear that your AAUP guideline that you rely on does not consider censorship to be disciplined and if censorship's not disciplined, every other section that you claim is breached really has no relevance because he wasn't suspended. He didn't lose his wages. He wasn't suspended and he didn't lose his tenure. So, I suppose we're back to the question of this censorship discipline and if so, why? I think you're frozen, Ms. Basil. Now, you're unfrozen. Okay, could you hear me? Okay. No, you were frozen. Oh, am I frozen right now? No, you're here now. Okay, great. Okay, great. Respectfully, it doesn't have to be necessarily a disciplinary action. It shows a strong disapproval by his colleagues and it is step one. It is a two-step process to have him removed his tenure. It's also a material adverse action, which altered the terms and conditions of his employment. You didn't have to lose tenure to be considered adverse action in a form of discipline, especially when you're in the academic or professional context. When an institution is censoring individual speech, it's often implying or here they outright said, we condemn his speech to the strongest degree. And then it operated also as a prior restraint where it gave him both a beware, fire beware. If you continue to make these articles or write these articles that we feel takes a position adverse from ours, there will be consequences. And then they alluded and added to different sections of the AAUP, which is incorporated by reference. Okay, what are his damages? The damages here are that he has had lost opportunity for wages. It's impacted his professional standing, his teaching opportunities. He's had classes canceled. He's been has not taught an upper level course. Then this has happened and we're talking about somebody in the in the college of. Philosophy who is. Mostly teaching graduate students or was before this article came out. And it's done to his professional growth as a professor. Moreover, he's also lost opportunities to. Have the different speaking engagements and writing engagements that he's had to that he's had for years, but all of a sudden, suddenly dried up. Even worse than that, he's been subjected to death threats. He had to have campus security for at least 2 weeks. It was not safe for him to be in the workplace. He's considered a pariah. They had a censorship dinner celebrating the censorship that they consider to be not actionable. So, let me interrupt you for just a moment when you're speaking about some of the adverse consequences and you pointed out how. Those adverse consequences flow from what the Paul did and not perhaps from the article itself. How is it that you attribute that? Paul, how tell me how you alleged that just. That that it's a consequence of of of what the university did and not not a consequence of the article itself. Well, I think when you look to when you look to the facts of what flowed from what happened after the article, you have a major escalation of what occurred. There was a. Leak to the paper of the draft resolution. You have the from Professor Provost in Demi and criticizing Jason Hill and pouting that, you know, the protests and boycotts, you know, she was proud of students for doing so. The unique targeting amongst him among the faculty. The provost is, you know, is almost up there with the president of the school and she's sitting there today. He was wrong. This was bad. What you did was good. It was encouragement. Can we stick to count one? However, if you're talking about breach of contract, and it appears to be a breach of primarily a breach of the procedure. In the handbook, what damages flowed if we accept that there was a breach of procedures that resulted in the resolution. What kind of what damages flow from that? I think you're frozen again. No, we lost it completely. I'm sure I apologize. I couldn't hear what you had said. And just saying, let's stick with count 1 for a moment on damages. Uh, what you just discussing to flow from some of the other counts, what damages flow from a breach of contract, which, which appear to be primarily a failure to follow procedure. Yes, absolutely. You're frozen again. We can't hear you. You know, maybe we should take a few minutes and let you people we cannot hear you. So maybe I'll get the minutes and have you see if you can. Get your Internet, or whatever the issue is, these other activities that he was paid for. And we weren't able to hear you. Perhaps just as Roger suggests, perhaps you should. Sign in again, or or see if there's something else you can do to boost your Internet. Because you're breaking up and it's difficult for us to hear you. Absolutely. I'll sign in. I'll sign back. I'll be right back. Can you hear me better now? Yeah, okay. I'm just start if you don't mind from. The beginning, I'm not sure what you guys heard and what you guys didn't. So hopefully this will. To be much better. So, in terms of his actual damages that flow from the breach of contract. We have the professional impact. Those would be the diminished prospects for future earnings outside of the Paul. We have the scented opportunities for the professional advancement both with. Within the Paul and outside the Paul, we have the loss of speaking engagements and extracurricular pay. We have the last opportunity for promotion and wage increases. As for the teaching opportunities, we have the cancellation of 3 of the summer and fall 2019 classes. We have reduced class sizes for the remaining courses that he's taught. And he has not taught an upper level course since all these actions by the Paul occurred. As for reputation, or actually, I'm not going to go there because it's only for the breach of contract. So, those are the 2 that will focus on the professional impact and the teaching opportunity. Can I ask a question? Is his pay been cut? Has he lost pay? He has not lost pay from DePaul's salary, but he's lost pay. Has he been demoted at DePaul? He's still a tenured full professor. Is that correct? He's still a tenured full professor, but the amount of courses that he's teaching, the type of courses that he's teaching, and just the terms of his employment has been significantly altered. Has he been, he's not been suspended from his job? Correct. And he certainly hasn't been fired. That's correct. So, why aren't these future damages that you're claiming purely speculative? We don't know. And there's no way to prove it. Well, in the past, we had multiple different speaking engagements that he routinely had, and he had the possibility and expectation that those would continue in the past. Certainly, that's an argument as to interference with prospective events. But my question is, as to a breach of contract claim, you have to prove actual damages now, and you don't allege him. I mean, all of these things that occurs to me that you're alleging are speculative in nature, and damages in a breach of contract have to be, the damages themselves have to be fudged with specificity so that it can be calculated. How would you calculate how much he lost from speaking engagement? Really, because how much he made in the past? That's correct, Your Honor. Okay. You know, I should comment very, very quickly, whoever drafted this complaint. Our Code of Civil Procedure requires a specific period for relief after each count. There is no specific relief after each count in the third amended complaint. There appears to be one huge claim for damages after the last count. But Section 2-604 of our Code requires a specific claim of damages prior after each count in the complaint, and it's not there. Go ahead. Your Honor, and just to clarify for a moment, I want to make sure that it's on the record that that was not Mr. Cooper or myself that drafted the third amended complaint. We inherited what was left, and at this point in time, we are hoping to be able to move forward and address some of those issues that are within the third amended complaint. I'm going to go back to what you said about the damages. You know, when you look at the engagements, which the school was very well aware of that he had these various different engagements, each one of them has a specific monetary amount attached to them. The extracurricular activities also have a monetary amount attached to them. When you have very low enrollment in courses, what flows from that is that the courses get canceled, and when you have a professor that isn't providing the classes that people want to take and the demand, now he's rendered obsolete. And, you know, while you might say that they're secular, the things that we already know concretely have happened as of this date. Courses were canceled. He lost extracurricular activities. He lost the speaking engagements and writing engagements, and he was also given a prior restraint on his speech by saying, you know, we're warning you, don't do this again or else. And now there's the threat that he potentially will lose. I'm going to ask you to comment on a phrase from the Seventh Circuit Court of Appeal. Where a censured employee retains his job and does not suffer any loss of pay or rank, any alleged harm to his statute or earning prospects is purely speculative. What I want to emphasize here is that this is, you know, we're at the pleading stages, the very early stages of the case. We hadn't taken any discovery at that point, and it's really hard for us to now pinpoint what those specific damages were beyond speculation or concreteness without having the benefit of discovery, without having the benefit of really investigating those facts and seeing how this has played out. Because remember, we only, we haven't even gotten to the pleading stage at the point of now where we're at with this appeal. Okay, go ahead. As we reiterated in our brief, we have, as Dave very much mentioned, there are specific guidelines and disciplinary matters that must be followed. And the allegations that were made were step one of step two to removing him for tenure. Now let's focus on the count two, which is defamation. The defamation claims that we've mentioned in the third amendment complaint are as follows. They fall into a few different categories, which are statements that were made in the Faculty Council resolution, statements that were made during the Faculty Council meeting, and statements that were in Dr. Ghanem's email. In the interest of time, I'm going to just briefly mention what these statements are. That he committed an abuse of academic freedom by not exercising adequate concern for accuracy, restraint, or respect for the opinions of others, as per the AAUP guidelines. Dr. Hill expresses positions that are factually inaccurate, advocate war crimes, ethnic cleansing, and give a voice to racism. His actions give grave doubts on the fitness for his position. He committed an abuse of academic freedom. His op-ed was factually inaccurate. He distorts facts, promotes racism, advocates war crimes, ethnic cleansing, and he gives a voice to racism. He also uses his right to academic freedom and free speech to disparage another group over another. The trial court here stated that Jason Hill was a public figure. As we stated, and outlined in a brief and provided much precedent for, he was not a public figure. And at that point, that's something for summary judgment. And again, as I stated before, we are merely at the pleading stages, where all facts that are alleged are not only the like most favorable to a plaintiff, but also... You're correct. The facts that are alleged are taken as true. But the conclusions that you draw from those facts are not taken as true. So the question becomes, are any of these statements defamatory? Or are they merely expressions of opinion on the part of the writer? Well, I think the thing that you have to really look at your honor here is that when you draft a faculty resolution, the resolution isn't based on opinion. It's based on verifiable facts. What's verifiable? Is it verifiable if you call someone a racist or exposing racist opinion? When you include additional facts that imply some sort of specific instance, or state that there was a prior instance or a history, as we stated in the Overhill case, yes, it is. This wasn't just a general statement that he was a racist. This reminds me a lot of the case where, I think it was Bradley, where she was a slut. It didn't specifically state how she was a slut, but it gave other context of there was the two guys that she was with and provides those kinds of context. Here, this was the same thing. He gives a voice to racism. In addition to that, the next step is he advocates for war crimes and ethnic cleansing. We condemn his actual article that was written about the Palestine-Israel conflict. This provides specific concrete incidents where you could actually verify those facts and see whether or not- By what? Being a racist or advocating for ethnic cleansing? I mean, that he exposes racist view. How do you verify whether he did or didn't? Other than to say one man has an opinion that he did, and he has an opinion that he didn't. Well, here it was more than just one opinion. It was the aggregate as the faculty council. It was also, you have to look at that. The main crux of the defamation cases are to not piecemeal or to isolate the statements, but to look at them as a whole and also look at what the writer intended to convey and what the reader perceived that to be. I think the Napoleon article where it says that he's condemned a faculty council for being factually inaccurate, I think that that all shows how it was perceived by the general public. No matter how you look at it, it's defamation. It wasn't some sort of abstract statement that, oh, he's just a racist, that guy. No, it was he's a racist who advocates for ethnic cleansing, genocide, all of the above. Those are all things that provide specific concrete examples of how it goes one step further than just making a requires a factually verifiable statement. On one hand, they're saying that they're conceding DePaul by saying this was a resolution that we drafted, and it was verifiable fact, and that's what they intended it to be. The AAUP also suggests that when he publishes it, he does it as a private citizen, not as a member of the faculty of DePaul. If you look at his article, he never says in there, these are my opinions. At the end of it, he says, my name is so-and-so, and I'm a professor at DePaul, and I teach, I'm in the philosophy department. So when you talk about the AAUP requirements of freedom, there's a little problem here with the article itself. Your Honor, I agree with what you're saying, the AAUP states, but I think that it's a red herring, because that was brought up in the brief of DePaul, and what DePaul has stated was that that wasn't brought up, but that wasn't in the court's order, and that also is outside of the factual, of the pleading. Hold on, you have to understand, the review of a dismissal under 2615 is a de novo review. We don't care what the trial court reasons. We only care about the trial court's result, and whether it was error to conclude, to issue the judgment, the issue. What the trial court reasons is not a concern of ours. The result of the trial court is our concern. Your Honor, respectfully, I agree with that, but de novo also doesn't allow us to bring in new arguments and new material into the appellate argument or record. Well, the appellee can argue anything in support of the judgment below that's borne out by these pleadings. The big question in this case is on the defamation case, is the faculty resolution nothing more than the expression of an opinion, and if it's an expression of an opinion, then it's not actual, but if it's an, if it alleges verifiable facts, facts that can be proven true or false, then in that particular case, it may rise to the level of defamation. So, now the question becomes, these allegations that you make, the defamatory statements, plaintiff abused academic freedom, his article's inaccurate, distorts facts, promotes racism, advocates war crimes and ethnic cleansing, and gives rise to racism. Are those opinions or are those verifiable factual statements where one could verify whether they're true? Well, let's just look at the distort facts statement or the factually inaccurate statement. As a professor, they're required to fact check. They're required to make sure that they're accurate in what they write. They can't, you know, just take a position and make up stories about it. They're calling him a liar. They're calling him a shoddy researcher. That's actually what was stated in the DePaulia article, which is how it was perceived by the readers. So, yes, absolutely, those are defamatory because you have them saying that we are distorting facts, or Jason has distorted facts, lies, and then passes it off as being a professor. It reminds me of the case, and I can analogize it with the Little League case, which was, I believe, the Green case, where they, you know, in that case, actually, it's different because in that case, they said, oh, he's a Little League coach, and we only relegated that public figure status to him being a Little League coach, and, you know, in that case, they found that it wasn't defamatory simply because not only did they say, okay, yes, maybe we told him, you know, he couldn't be a coach anymore, but the bigger issue was that he still could help out in any way possible on those other issues, like, you know, for his own channel team, stuff like that. So, here, we have a situation where we have not that happening, where he promotes racism, but also distorts facts, lies, does shoddy research, and is bad example for other students. It's essentially the crux of what the argument was. He's a genocide supporter. Those are all verifiable facts. They're not some sort of abstract concept that you can't definitively say whether or not that person advocates, and especially in the position of him being a professor where he's held to the standard of being a role model, and even more so, let's not even talk about the fact that in the faculty resolution. Mr. Hazel, let me interrupt you. Part of the problem I'm seeing here is that you're sort of taking this out of context. This was an op-ed, an opinion editorial. So, what the good doctor was doing was expressing his opinion in an editorial setting. This wasn't in the, although he's a professor, it wasn't in the guise of some academic publication. This was an opinion editorial, and like any opinion editorial, it invites the reader to form their own opinion. That's what an opinion editorial does. It is the author's opinion, and he or she is, it's an editorial, and they're editorializing as it were. So, it seems to me when you talk about what's verifiable and what isn't verifiable, and that the professor was doing this, not as the, although as Justice Hoffman points out, he concludes that he was, he's a professor at DePaul. Nonetheless, this was him acting privately, not as a professor from DePaul. He is writing an opinion editorial, and so I think in your discussion, we have to keep that in context. Your Honor, I think you hit the nail on the head with this case in a much more eloquent way that I've said. The bottom line here is that Jason Hill wrote an op-ed piece. He was entitled to his position. What DePaul did was not something that was providing their opinion. It wasn't like they wrote a comment underneath the article and said, this is how we feel about it. We condemn this. We think this is wrong. No, they wrote a faculty resolution that was passed that is required pursuant to both the faculty council manual and the AAUP to be a verifiably factual statement. They can't include opinion. So, Professor Hill's op-ed was an opinion, but the faculty resolution was not. The statements that were made in the faculty resolution meeting were not. Hold on one second. Hold on. The faculty resolution was not passed in the context of a disciplinary proceeding. If you read the faculty resolution, it reads to me like an answer to Professor Hill's article saying, we don't agree with this, and we don't agree with this for the following reasons, and we condemn it because it advocates racism, it advocates genocide, or whatever else you allege. Recent article by Professor Hill, moral case, one misrepresented the history of the unresolved Palestine conflict, distorts the facts about the current state of relations, promotes racism towards Arabs generally and Palestinians particularly, and advocates for war crimes and ethnic cleansing against the Palestinian population. That's what they said, and then they went on to the next paragraph saying, you know, we certainly agree that the professor has the right to publish and express his opinions consistent with the faculty manual in guiding principles of speech or expression. They just say that if the article failed to exercise adequate concern for accuracy, restraint, or respect for the opinions of others, the article represents an abuse of academic freedom, condemns both the tone and content of it. That's what the resolution says. Your honor, but respectfully, even if the faculty resolution wasn't something that was disciplinary in nature, regardless of anything, it was published. It was published not only to all peers, but also to the campus-wide through the DePaulia and to the public at large, because the DePaulia is a public syndication. So it doesn't matter whether or not it was a disciplinary punitive measure, it matters that it was published, and here it was. On top of that, you have Thelma Gunham, the provost, email, send out to the whole entire student body of the largest Catholic in the United States. Okay, I understand what you're arguing. And further, I hope I didn't interrupt you, but if I could further state that this was an ad hominem attack against Jason Hill personally. His research is shoddy. He's a supporter of genocide. It wasn't that his article is a supporter of genocide. No, it was saying that he supports ethnic cleansing. He gives a voice to racism. It was about him personally, an attack on him, not the article and the content within the article. This resolution was on a point-by-point rebuttal of his op-ed piece. It was an attack against him personally, Jason Hill, the individual, the professor at DePaul University, the one who they stated, his actions raise grave doubts concerning his fitness for his position. If that's not quintessential defamation per se, I don't know what is. I only want to correct you because I'm reading from the resolution right now where it says, the recent article published by Jason Hill, one, misrepresents, two, suggests this is a criticism of the article, not of Jason Hill, not until you get to, I suppose, the condemnation of the opinions contained therein. The article failed to exercise adequate concern for accuracy, restraint, et cetera. The code and content of the article, the resolution directly against the article itself and the opinions contained therein. I suppose I'm back to my other question. Why isn't the resolution nothing more than an expression of opinion? Well, as I stated, there's three different types of defamatory statements that I categorized into three different sections. The faculty resolution is only one of those three. You have the email from Salma Ghanem, which we allege is a separate action of defamation based on him abusing his academic freedom. Then you have the other statement, which is, are the statements that were made during the passage of the faculty resolution. The faculty resolution meeting. There was a censure. That was never done before to any other professor at any other time in DePaul University's history. That may be your human rights violation action, but it's not your defamation action. Your Honor, respectfully, I disagree because if anything that's going to put him into disrepute or denigrate him in the eyes of his peers or the public and getting a public lecture is worse than a slap on the wrist, especially when you're in academia. Well, the censure itself is not defamatory. It's the content of the resolution or what was said about him is the defamatory material, not the fact that it resulted in a censure or condemnation. The resolution was intended to and did result in problems for Jason, Dr. Hill personally. It did not result in the publication of this article or as a rebuttal to the article. Here we have what was put into the resolution as a prior restraint in the future for his speech, but also in the past by calling him a liar and saying that it was factually inadequate and everything else because obviously it wasn't just the article itself. It was the person addressed to the article that was factually inaccurate, that failed to fact check, that lied. You have gone over. I don't know if you want to touch upon the other counts that you have not discussed yet. Yes, if that's okay, Your Honor. If I could just have a few minutes on that. Yes. Okay. Thank you. Count 3b alleged tortious interference with the perspective advantage against all defendants. Now, as we had alluded to during some of the different parts of this argument, there was a significant damage that occurred to him and there wasn't interference with the economic advantage. That included not only his ability for future engagements that were suddenly dried up, his extracurricular activities within DePaul itself, and the argument that there was a reasonable expectation of entering into these valid business relationships flow from a couple of things. One, that he had these in the past. They were publicly available to the general public. Two, the defendant knew about these different engagements as alleged in our complaint. And three, this was an intentional unjustified interference by the defendants because they had never before done a public censure on another professor at any other time. There's other professors that had... Can DePaul University ever be liable for tortious interference with Professor Hill's relationship with DePaul itself? Not with DePaul itself, but with the other speakers. You do allege it. There's a difference between his claims of interference with promotion, et cetera, and so on at DePaul and his claims of interference with prospective advantage with third party. My question is, can you ever sustain a cause of action against an employer for tortious interference with its own employment contract? Well, that would fall under the tortious interference with the contract itself of the employer, which would be DePaul. An employer cannot be liable for tortious interference with prospective advantage as it to the employer itself. I mean, the cases are legion. It just cannot be. But my next question is, what about the employees? Can the employees be found guilty or liable for tortious interference with the employee's contractual rights or prospective advantage with the employer itself? Can the employees be held liable? I'm going to answer your questions twofold, but I want to make sure I answer each one. So with respect to the first one, whether or not an employer could be liable for a prospective advantage within itself, I agree with you. There are lots of precedents that flow from that. But here we have a situation where we're only at the pleading stage. So all we have to do is argue or provide some sort of entitlement to release, even if it wasn't something that we specifically alleged within our complaint. And we argue that, again, as we stated, we did not drop a third-amended complaint. Had we dropped it, we would have had a claim in there for the tortious interference with contract, as well as the tortious interference with prospective contract. Now, on to your second claim that you had stated about whether or not the employees- Let me understand something. Are you saying that an individual could be found guilty with a tortious interference with a contract that that individual entered into? No, I'm talking about the institution. Contract, but certainly not tortious interference. I'm talking about the employer itself. Yes. And with current, tortious interference with current contract, not prospective. Well, tortious interference with a current contract? Breach of contract, maybe, but tortious interference with your own contract? I have tortiously interfered with a contract that I'm a party to? Well, I think here, you have college professors, which are in a unique position. I understand what you're saying here, but he's a professor. And right now, once they receive a tenure, it's a little bit different than a traditional contract law. But on to the second point that you'd stated about the employees and whether or not they could be potentially liable, I think that at this stage, only if a person is a professional we have not had the benefit of discovery. We do not yet know if they were acting in their personal capacity. Don't you have to allege that they were acting as individuals and not as agents of DePaul? Of course, you don't want to allege that for count one, do you? Well, that would be correct. I think that what is represented, this is a very unsettled area regarding the specific employees and whether or not they were acting in their professional capacity, personal capacity. And without the benefit of discovery, we don't know that. All we have is what we alleged in the third amended complaint. And what we alleged in the third amended complaint was that specific steps were taken that were biased to individuals that pay Selma Ghanem and the institution as a whole. And as a result of that, we are entitled to at least to have that in the light most favorable to us. And this is a dismissal with prejudice, meaning that we can't even go back and amend the complaint. And that's what we're trying to do here. We're just trying to get a remand back to state court to properly allege and clean up the third amended complaint, which we didn't have any party to at that time. Isn't the problem that the plaintiff was given opportunities to amend his complaint when the prior complaints were dismissed? We're on the third or fourth complaint now. And so how many times do you get to amend it? Well, proceedings are really construed and the amendments should be given to promote justice and in the interest of promoting that justice. And here it's clear that there's a lot more that meets the surface of the complaint. I think that you guys have raised some great questions as to where are certain things defamatory, are certain people subject to the contract. But right now, we have to remember that we hadn't got past the screening phase. We hadn't taken any discovery. We don't have that benefit of knowing what we would know in hindsight if this was a motion for summary judgment, which it's not. And then finally, as to the last count, which is the Illinois human rights count, let me briefly speak about that one. Jason Hill is a dark-complected homosexual man from the Caribbean. He is in the College of Philosophy, which is surrounded by white spheres where nobody is of his descent and nobody is homosexual, at least not at the time in question. He alleges that he was racially discriminated by DePaul as an African-American because he was expected to adhere to a certain opinion that African-Americans had ancestry to them. Ancestors who were slaves. And they should, in fact, view the Palestinians as being enslaved as an enslaved race and the Israeli government as a slave regime, simply because of the color of his skin and where he comes from. What we have to support this is that several other professors had taken very extreme positions or controversial positions that are in statements that have been the subject of actions of the government concerning Palestinian residents of the territories of the West Bank and Gaza. And they were never subjected to a public censure. They were never had emails written about them saying that, you know, we condemn his actions, we abuse their academic freedom. None of those people were doing that. And none of those people were of Caribbean or African descent or homosexual. And for these reasons, we say that what flowed next was that there was material alterations of his employment conditions, as we touched on before. He wasn't able to teach his extracurricular. He has not taught an upper-level course since this article. He had a public censure that was an unprecedented move. He is considered a pariah. His peers won't even speak with him. They had a censorship dinner to celebrate this. They gave, DePaul gave the student body one whole building to distribute paraphernalia and boycott and advocate for the so-called dumping of Jason Hill. He had death threats against him. The death threats weren't investigated by DePaul. They didn't do anything about it. The only thing he got was campus security, which, you know, had been extended for at least two weeks at that point. Yet we have no answers on who did that, who would make the death threats, what actually happened to them. Was there any investigation at all? Those are all questions, I think, for discovery and why we should be given remand to at least retrieve this complaint and give this case the best shot to do the most substantial justice between the parties and for Jason Hill in particular. Thank you. Thank you, counsel. If the FLE would like to proceed, please. Thank you, your honor. May it please the court. Isaac Newton's third law of motion states, for every action, there is an equal and opposite reaction. We're here today because Dr. Hill published a provocative and controversial article, knowing full well that it would prompt a response from the university community. He didn't like the response, and now he's blaming the university, the provost, and the president of faculty council for the fallout. I could quote various provisions of the article. I know you've read the article, but statements like not all cultures are indeed equal, some are abysmally inferior and regretted, and going on to say Palestinians constitute a national security threat to Israel, and therefore only a policy of radical containment or expulsion remains a viable option, these are just some of the statements published in that article by Jason Hill that I know you've read. And I'm going to go through each of the counts as you have requested, but I'd like to make a few points that I think are germane to each of the counts. Plaintiffs' allegations in the Third Amendment complaint are insufficient to hold the tall university liable for any of the actions of its students or its faculty in response to their disagreement of Jason Hill's article. At no time did any member of the tall university administration ever use the term censure. That term does not appear anywhere in the default faculty handbook and is not a mechanism for taking any action against a faculty member. It simply doesn't exist at DePaul University. Dr. Hill was never disciplined in any way, shape, or form by DePaul. And five years later, Dr. Hill remains a full-time, tenured, full professor at DePaul, continuing to publish controversial statements garnering complaints from the DePaul community. And finally, Dr. Hill has not pled any damages as a result from any actions taken by DePaul, Dr. Pace, or Dr. Gatton. Despite having several opportunities, Dr. Hill failed to state a claim upon which release could be granted. First of all, he failed to plausibly allege that DePaul breached any contractual obligation to him or that he suffered any damages as a result. Second, the alleged defamatory statements are subject to the innocent construction rule and are non-actionable opinions. Third, Jason Hill failed to plausibly allege that defendants induced any third parties to terminate their relationship with him, causing him any damages whatsoever. And finally, Jason Hill failed to plead that he suffered any adverse action in order to state a discrimination claim under the Illinois Human Rights Act. The terms and conditions of his employment have not changed. Now, I will turn to the first count of the complaint, which was the breach of contract against DePaul. We have difficulty understanding at times what the Third Amendment complaint alleges, but as best we can understand it, there are three alleged breaches of the contract, and the first is an allegation that Dr. Hill's academic freedom was violated, which is guaranteed by Chapter 6.1 of the Faculty Handbook. And I would like to note that 6.1 of the Faculty Handbook states that not only the faculty, but also the students and other members of the university community enjoy academic freedom as they participate in various forms of open inquiry and debate. Now, both the Faculty Council's resolution and Provost Ghanem's statement specifically and without question affirmed Dr. Hill's right to express his opinions. The resolution doesn't even mention the word censor or discipline, and as the lower court correctly pointed out, there's no contractual obligation that defendants refrain from discussing or criticizing plaintiff's opinion. Even if this court believes that Faculty Council's resolution somehow infringed upon Dr. Hill's academic freedom, he failed to allege that DePaul sufficiently controlled the actions of Faculty Council such that DePaul would be liable for their passing the resolution. Now, agency requires allegations that DePaul controlled or had the right to control Faculty Council, that Faculty Council consented to act on behalf of DePaul, and that Faculty Council did in fact act on behalf of DePaul. Nothing in the Faculty Handbook states that Faculty Council has power to make any decisions related to any other faculty member's employment or to sanction or discipline a faculty member in any way. And as the lower court correctly held, there were no actions that constituted a sanction in this particular case. Also, there were no damages, as this was discussed during counsel's first argument, only alleged, Dr. Hill has only alleged potential future damages, which are speculative in nature. The bottom line is that Dr. Hill was not censored, nor was his speech chilled. He still continues to take advantage of the right to publish on these matters. The second violation, as we understand it, of the Faculty Handbook is a violation of section 1.3.6, which requires all decisions and recommendations of the Faculty Council to be forwarded to the provost or president for approval. Excuse me for one second. I'm sorry. Your assertion that the damages, all of his damages are speculative, would apply to every allegation of breach in the contract, would they not? That is correct. Okay, go ahead. So, as I mentioned, section 1.3.6 requires all decisions and recommendations to go to the president and provost for approval and for them to take certain actions. There can be no question that the Faculty Council resolution on academic freedom and responsibility is not a decision, and it's not a recommendation. It neither calls for any action to be taken, nor does it require any action to be taken. As we know, the provost acknowledged the resolution and moved on with their day. So, there can't be a violation of this section, since nothing was required of the administration in response to the resolution. The 3rd allegation of breach of contract, again, as we understand the 3rd amended complaint, relates to section 4.4 of the handbook, and that section states that disciplinary proceedings are reserved for situations that warrant the imposition of a major or minor sanction by the dean and or the provost. In this case, there are no allegations that the dean or the provost imposed any form of sanction against Dr. Hill that would have warranted a disciplinary proceeding. Criticisms of the opinions expressed in his article doesn't count as a sanction. Dr. Hill suffered no discipline as a result of the article, and his convoluted breach of contract claim on this point is essentially that DePaul breached the faculty handbook by not putting him through a disciplinary process, by not bringing charges against him, and by not conducting formal proceedings to strip him of his tenure or to terminate his employment. The reality is, had DePaul actually disciplined him for expressing his opinions, he may have had a meritorious breach of contract claim, but he doesn't have one. Accordingly, we ask that you affirm the lower court's dismissal of the breach of contract claims and count 1 of the 3rd amended complaint. Count 2, as you know, is for defamation per se, against Dr. Page and DePaul, as best we understand it. Again, there are some issues here. As well as we can tell, there are 3 purported statements that are considered to be defamatory by Dr. Hill. The first are generally purported statements made at the faculty council meeting. Now, the 3rd amended complaint doesn't clearly identify any such statement, and there's no reference in appellant's brief to any such statement. Therefore, we don't believe those are properly before the court. The second alleged defamatory statement is Dr. Ghanem's May 15th, 2019 email to the university community. The 3rd amended complaint doesn't clearly allege that Dr. Ghanem's email was defamatory. In fact, those allegations were dismissed with prejudice, were not properly preserved, and are not subject to this appeal. There's no argument in appellant's opening brief about why the email was defamatory, and we believe that argument is waived. At best, the 3rd amended complaint and appellant's reply brief allege that Dr. Ghanem's email was an endorsement or a ratification of the resolution, but her email didn't even reference the resolution. Rather, her email expresses the provost's opinion that she was deeply saddened that Professor Hill used his right to academic freedom and free speech to disparage one group over the other. Dr. Ghanem's opinions are non-actionable and cannot form the basis of a defamation claim. The 3rd and probably most important argument here is the alleged defamatory nature of the Faculty Council resolution. Now, first, the resolution is not a statement made by Dr. Pace, nor is it a statement made by DePaul University. It's a statement by Faculty Council, a group of the faculty. They don't speak for the university. The lower court correctly held that the 3rd amended complaint does not allege that DePaul, Pace, or Ghanem made any statements, only that Faculty Council passed the resolution. Plaintiff did not allege in this case that DePaul sufficiently controlled the actions of Faculty Council in order to be liable for Faculty Council's conduct in passing the  Again, I went through the elements of agency, and they're not properly fled in this case. Moreover, the Faculty Council resolution is capable of innocent construction. The resolution was critical of Jason Hill and disagreed with his views, but did not impute that he could not perform his profession as a faculty member and did not call for his removal. The resolution is also non-actionable opinion. When courts determine this, they look at whether the statement has a precise and readily verifiable, and whether the statement's literary or social context signals that it has factual content. As Justice Hoffman pointed out, by and large, the statement, including the Faculty Council resolution, are not verifiable. And I submit to you that the social context of the document itself signals that it is in response to Dr. Hill's opinion in the Federalist. It is an opinion about his opinions, and it's an opinion by a group of his peers. It's not an opinion by DePaul University, and it's not an opinion directly attributed to Dr. Case. As the lower court correctly pointed out- What about the statement that it's factually inaccurate? That could be verified, could it not? Well, I think that academics debate about history all the time. And a large part of Dr. Hill's article is talking about what happened in history. And I don't think it's necessarily factually verifiable, because while we have excerpts of things that have happened over the years and in ancient history, we don't know for sure. So I think most of what history teaches us can be debated and is not necessarily verifiable. As the lower court correctly pointed out, the Faculty Council Resolution is a strong statement of opinion about plaintiff's advocacy. It's not about his actions. It's an opinion about his opinions. As we know from Illinois and Seventh Circuit case law, name calling is not actionable. Calling someone a racist is not verifiable. These are not actionable things. And I think that the statements in the Faculty Council Resolution need to be examined in light of the entire document, which is clearly an affirmation of academic freedom, an affirmation of First Amendment rights, but a disagreement with the way in which Dr. Hill used his right to academic freedom and First Amendment to espouse his opinions. For these reasons, we'd ask that you affirm the dismissal of Count 2 and plaintiff's Third Amendment complaint. With regard to Count 3, which is the tortious interference with prospective economic advantage against all defendants in this matter, the elements here are the existence of a valid business relationship or expectancy, the defendant's knowledge of plaintiff's relationship or expectancy, an intentional and unjustified interference by the defendant inducing or a breach or termination of the expectancy, and damages to plaintiff resulting from such interference. Now, again, as we understand it, there are two claims that fall in this count, and the first is interference with the employment relationship with DePaul. The second would be interference with plaintiff's relationships with other institutions or publications outside of DePaul for which he could receive income. Now, as Justice Hoffman pointed out, the case law couldn't be clearer, that DePaul cannot interfere with its own contract with Dr. Hill. And Dr. Hill has not alleged that Drs. Pace or Ghanem acted solely for their personal gain or contrary to the best interest of DePaul in any actions they took. With regard to outside opportunities, Dr. Hill has not alleged that the statement by counsel was a statement by DePaul, Pace, or Ghanem, and he failed to allege that any of the defendants induced a third party to terminate its contract with him. Again, Drs. Pace and Ghanem must have acted intentionally and with the purpose of injuring plaintiff's expectancy, not merely that they had a consequential impact on his opportunities. There are no allegations that the defendants knew a plaintiff's relationship with any of the entities for publications or speaking engagements. Are you sure that my reading of the third amendment complaint says that DePaul and people at DePaul were well aware of his outside opportunities that he had in the past? And there's also, I believe, an allegation in the complaint that says they purposefully interfered with it intending to damage it, unless I misread this complaint. Your Honor, we believe that's conclusory. I mean, he doesn't specifically state any knowledge of any specific opportunity that was infringed upon. And even if we were to believe that the defendants had knowledge of these expectancies, these speculative future opportunities, he can't so he cannot meet the elements of this case. But any damages that he may receive in the future as a result of unknown expectancies is fully- I may reference, address you to paragraph 120 of the complaint under interference. As alleged above, the defendants knew of Dr. Hill's professional relationship with academic institutions and publications outside of DePaul. And they're, by the way, defined in the prior paragraph. Knew that he regularly received remunerations for his work within those institutions and publications before the spring of 2019. Because of their animus, however, coming into head of spring 19, the defendants set out to reputation and in so doing, abort his relationship with institutions and publications. So there is an allegation in here they knew about it. And there's further allegation in here that they did it intentionally. Okay. Yeah, go ahead. I was just going to point out that there's still no allegation that Dr. Pace or Dr. Gowna acted solely for their own personal benefit or contrary to the best interest of- Well, that's different. That argument is a good argument as it relates to the ability to interfere with their employer's perspective relationships with Dr. Hill. No question about it. That falls almost under the same exemption as the employer cannot interfere with its own perspective contrary to relationships. But is that true as to the third parties? Arguably, we believe that these allegations are conclusory. He doesn't identify any specific relationships, any publications, any opportunities that were infringed upon. In addition to that, even if he could make out the element of purposeful interference, he still can't make out the element of damages. And therefore, we ask that you affirm the lower court's dismissal of count three of plaintiff's third amendment complaint. And now I will move on to count four, which is a violation of Illinois Human Rights Act related to race, color, ethnicity, and sexual orientation against DePaul University. Can I back up for one second? On your argument is this inability to plead damages for perspective interference with their secular values. Are you relying almost exclusively on Anderson? Is that the basis of your argument? Oh, don't take the time to look at it. I'll look at it later. Never mind. I apologize. I think that plaintiff's complaint is lacking in various respects in that regard. But mostly, and I think we can hang our hat on the fact that he has not sufficiently alleged damages, only speculative damages in nature. Okay. All right. And I will move on, as I mentioned, to the violations of the Illinois Human Rights Act that are alleged against DePaul University. This requires Dr. Hill to demonstrate that he's a member of a protected class, that he was meeting his employer's legitimate expectations, that he similarly situated employees outside the protected class were treated more favorably. Now, for purposes of the argument, way back when, when we argued for dismissal of the third amendment complaint, we took the fact that he's a member of a protected class and that he was meeting his employer's legitimate job expectations as given. We don't necessarily agree that he's continued to meet his employer's legitimate job expectations. We also don't think that by failing to indicate when he was publishing his article, that he was publishing for his own personal opinions and not on behalf of DePaul University. We don't think that that was meeting his employer's legitimate job expectations. But even- Is it really the issue on this count whether he suffered a materially adverse employment action? Yes, your honor. We think he failed to plead that he suffered an adverse action and he failed to demonstrate that similarly situated employees outside the protected class were treated more favorably. And I can go through each of those points. There was no material adverse action here. Oral and written reprimands do not constitute an adverse action. Jason Hill did not plead any material change to the terms and conditions of his employment. There's been no reduction in his pay or no diminution in his job responsibilities. Speculative adverse action is not adverse action. The resolution was an action by his peers and not an action by DePaul University. Students held protests, distributed leaflets, held a dinner, and refused to take his courses. The students speak for the students. They don't speak for DePaul University and their actions can't be attributed to the terms and conditions of his employment. In addition to that, we would argue that there are no similarly situated faculty members because no other faculty drafted an article stating the things that Dr. Hill stated and attributing himself as a professor of DePaul University. Therefore, he can't keep comparing apples to oranges if he's trying to point out, you know, other faculty member published things, but they weren't subject to a resolution and they were not subject to student protests. As a result, we request that this court affirm the lower court's dismissal of counts one through four of Dr. Hill's third amendment complaint. As the count four, would he be required to feed the other faculty members published the same opinions that he published and they were not subject to condemnation? Or is he merely required to plead that no other faculty member who has published anything has ever been the subject of a condemnation resolution by the faculty council? Your Honor, I think similarly situated would require at a minimum him to point out a very controversial opinion that was published by a faculty member that caused backlash in the community and didn't result in a faculty council resolution. Faculty members publish all sorts of things all the time and just because a faculty member publishes, that doesn't make him similarly situated to Dr. Hill in this particular case and for purposes of allegations in court. Thank you. Any other questions from the panel? Thank you. And if you would like to respond, you may go ahead. Okay, great. Thank you. Your Honors, when there is a dismissal with prejudice under 2615, the question is not what did the plaintiff allege, but rather what could they allege? And is there any fact that could entitle the plaintiff to release? There is no cap in the codicil procedure on the amount of amendments to the pleading, but rather pleading should be construed and amendments should be liberally granted to effectuate justice between the parties. Additionally, throughout the Paul's argument, they made several different factual arguments that are inappropriate for purposes of a motion to dismiss under 2615. And whenever they try to allege that there was conclusory statements and everything else, but for purposes of 2615, the statements that are well pledged must be alleged as true. And as for the whole statement about the, even assuming the resolution didn't have an action, here, there was a resolution that was taken. What was the purpose of the resolution? Sure, there was no specific action at that point, but the damage was done. The precedent was set. It was step one of step two to start removing his tenure. It was a prior restraint for him. It was told, you know, if you keep these controversial articles, even though it's an op-ed piece, and even though you have academic freedom, there are going to be consequences. There was a purpose to it. It wasn't just to voice their opinions. There was a reason behind it. If it was to voice their opinions in a matter of some sort of academic discourse setting, they could have had went to a coffee shop and had, you know, that same sort of peaceful interaction. But no, this was written. This was premeditated. This was deliberate and had statements that were inflammatory, that were false, that were injurious, and that denigrated him in the eyes of the community. Additionally, let's talk about the Illinois Human Rights Count. There doesn't always have to be a comparator, especially when, as alleged here, he is the only African American in the philosophy department. He is the only person that is a homosexual in the philosophy department at that time. He made several different statements and pleas for help that were showing, I am subject to a hostile work environment. I am being death-threatened. I have to have campus walking me back. I have to get the security for the campus to walk me back. This has to proceed for two weeks. Students are boycotting against me. But also, let's talk about the boycotts for a second. DePaul gave the students a place that was a DePaul University-owned building to effectuate those boycotts. They didn't investigate the death threats that were presumably, at this point, as alleged in the third line of complaint, coming from a DePaul student or faculty member. Again, we haven't had the courtesy or luxury of having discovery in this matter, which would definitely illuminate a lot of these issues. And, you know, the points that did not have a 2615 motion. And lastly, I'd like to direct the court to a case that would be considered persuasive authority, and that would be Lavallee versus the village of Melrose Park, where the court held that a material alteration of his employment occurred, and it did not require a comparator. And that citation is 734-S. It is not, Your Honor. Then the proper method would be to file a motion to cite additional authority. Because arguing that case in your rebuttal, it bribes your opponent of the ability to address it. And that's almost like checking and raising in a card game. It's just not done. Okay. That is true, Your Honor. And I will definitely make sure and make a note of that. But in conclusion, and as we stated, at the pleading stage, the question is not, did he allege? Or rather, could he allege? Or is there any sort of facts that would not allow him to allege? And as we stated before, and as we stated in our brief, there is no, there is a set of facts he can recover from. And there's a lot more than meets the surface of this complaint. Recovery will definitely help us guide those forces. And we ask that this court grant us a remand back to state court. Thank you. Thank you. Any other questions? We thank both. Thank you. Thank you. Yes. I thank both of you for your presentation and the case will be taken under advisement. Thank you. Thank you.